May it please the Court, Deanne Maynard, on behalf of Fannie Mae, I'd like to reserve three minutes of time for rebuttal. You may, but keep track of your time because we may ask questions. Thank you, Your Honor. Under the plain language of the statute and the guidance of the agencies charged with interpreting it, Fannie Mae is not a consumer reporting agency under the Fair Credit Reporting Act. This is true for two independent reasons. First, by making software that others use, Fannie Mae is not itself engaging in the assembly or evaluation of any information. And second, in any event, Fannie Mae's purpose in providing the software is not the purpose covered by the statute. I'll start with the first reason. Under the statute, to be a consumer reporting agency, someone must engage in the practice of assembling or evaluating consumer credit information. That means the text requires the person to actually be doing it themselves. But here, Fannie Mae makes software that may allow others to do that. Can anybody buy the software? You have to license it from Fannie Mae, but you may license the software from Fannie Mae. Can they pay a price for that? Not anymore, Your Honor, but at the relevant time, yes, they paid a licensing fee to license the software. Do we have to worry about the licensing contract? I think the licensing contract is relevant here to the extent that it shows that the person who's using the software is the one who is engaging in the assembly or evaluation of any information. The license makes clear that it's the lender who collects the information from the borrower and enters it into the software. It's the lender who must enter into separate agreements with actual consumer reporting agencies to gather data on the lender's credit history. And it's the lender who uses the software to pull that information into the software. And then it's the lender who generates the findings report that is generated. All of the relevant activities are the lender. Now, the dis- Counsel, with respect, I mean, you sound like, you know, Uber saying we're not a transportation company, we're a technology company. We just provide software that provides drivers with passengers, so don't expect us to be a transportation company. When, you know, the agency decides to do this, and the ramifications of what it's doing are people get a don't get their loans because of that generated information and it may be erroneous, you are no longer just providing software, aren't you? Well, I think, Judge Leisling, under the guidance from the agencies, software providers, even software providers who allow others to assemble and evaluate consumer credit information, so the agencies have FTC addressed a long time ago a specific example where a software company developed software that would allow someone to import the data from the three main credit bureaus and merge the data and then purge it of duplication. And the FTC concluded that the software company in that case is not the one doing the assembling and evaluating. When Fannie Mae develops these algorithms, Your Honor, there's no consumer information in them. It makes this tool available. And I think it's important to take a step back and see how this developed. Fannie Mae puts out a selling guide, a manual book, that before Fannie Mae developed this tool that lenders can choose to use, lenders, the only way to do it was to manually underwrite using the book. In that instance, it's clear that Fannie Mae is not the one going through and analyzing. And the same is true, just because Fannie Mae has made a tool that if lenders choose to use it, it can automate to a certain extent within the limitations of software, that analysis, it's still the lender who's choosing to use the tool. It's still the lender. The lender is the only one who's The district court thought otherwise because the lender is unaware of the proprietary formulas that Fannie Mae has used to create the software. But that's true of all software. And if that were true, then the FTC's example would be wrong. All of us use tools every day, including software tools, that we don't know how it works. That doesn't change the debt to make the developer the one who's using the tool. So, no, I think the facts here show that what Fannie Mae is doing with relation to the software is just with it. The upshot of what this is, is whether or not Fannie Mae likely will buy the mortgage. Is that correct? That's right. The outline in the computer program is to go to that issue, if I understand your argument, and then the person using the tool has to input the data into the outline that Fannie Mae has developed. Is that correct? That's correct. And that's, that, if I may segue to my second independent reason why the district court should be reversed, is the purpose. Fannie Mae is developing the purpose, you're right, Judge Wallace, for the purpose of allowing the lender to get a preliminary view of the conditions under which Fannie Mae might purchase the loan. But the machine itself, the tool, doesn't tell you that until you put in data. But it's, yes, but it's the lender who puts the data in. That's your point, I take it. That's our first point. The lender is the one using the tool, choosing to use the tool. The lender is the one interacting with the borrower's information. After all, it's the lender who's meeting with the borrower. The lender is collecting that information from the borrower. The lender is required to get, to buy and purchase and get agreements from separate, you know, the big, you know, consumer reporting agencies and put that data into the software. But then, to our second point, Your Honor, so that's one reason why the district court is wrong. The district court is also wrong because it believed that it did not matter why Fannie Mae was making this software available. But the statute requires an inquiry into the purpose. And the agencies, both the FTC and the Consumer Financial Protection Bureau, have concluded that simply the fact that one evaluates and assembles, assembles or evaluates information and provides the results of that to another does not put one into the definition of consumer reporting agency. And here, the purpose, Fannie Mae's purpose in developing this software is to allow lenders to get a preliminary view, as I said earlier, of whether or not and under what conditions Fannie Mae might buy the loan. After all, Fannie Mae doesn't make loans in the primary market. It's not allowed to make loans to consumers. Congress created Fannie Mae to create liquidity in the primary mortgage market. And so Fannie Mae is giving, has created this tool. Its purpose in creating this tool is to allow lenders to assess, as they do with the book, the selling manual, whether or not Fannie Mae might be willing and under what conditions to purchase the loan. That's not the purpose covered by the statute. And it's very similar to the agency guidance from both the FTC and the Consumer Financial Protection Bureau, which have said that, for example, in the instance where a lender might share information with a private mortgage insurer about a particular consumer, to see whether or not, if the lender makes a prospective loan to this consumer, the private mortgage insurer would insure the lender against the risk of that loan. And both of these agencies have said that in that instance, neither the lender nor the private mortgage insurer is a consumer reporting agency, because their purpose is to assess that particular transaction. Their purpose is not for the purpose of providing consumer credit information to third parties. Fannie Mae is in an exactly analogous situation here. Even if one thinks, and we don't, that Fannie Mae is assembling or evaluating any information by making the software tool available, its purpose is to give the lender a preview, just like with the private mortgage insurer, about whether or not Fannie Mae will, in essence, you know, back up this particular loan to this consumer. It's a very transaction-specific engagement, and therefore doesn't make Fannie Mae a consumer reporting agency. Castle, I have a sort of off-the-wall procedural question to ask you. Both of the trial on the merits. And I'm not sure that's true. It seems to be, as far as I can tell, an open question in this circuit. So what is your view on whether that is sort of procedurally available to us? It is, Your Honor. This is not this is a this was a grant of summary judgment. The district court granted partial You think that should have been granted in your favor, right? We do. So it was competing summary judgments. But this isn't a situation where summary judgment is denied, and then the issue on which it's denied goes to trial, and further facts may have been developed at the trial. This is not that situation. This is different. This was a straight-up legal question. Both parties argued in cross-motions for summary judgment. The district court granted partial summary judgment to the plaintiffs on these two issues. And therefore, when we went to the trial, the jury was instructed as a matter of law that Fannie Mae was a consumer reporting agency and met these two elements. And that sets up the issue for appeal. So it is preserved for appeal. It isn't the kind of situation that you're thinking of where or that you may be thinking of where summary judgment is denied and then it goes to trial. An actual grant where this issue was taken off, it would have been futile for us to object at any point after that. The judge had squarely ruled and it had been decided. Okay. If there are no further questions, I would like to reserve the balance of my time. You may do that. Thank you. Good morning. May it please the Court, my name is Sylvia Goldsmith. I'm here with my co-counsel, Mr. Mangandoth, on behalf of the Plaintiffs Appellees, the Zabriskis. The district court properly entered an order granting partial summary judgment on the legal question of whether or not Fannie Mae constitutes a consumer reporting agency under the statute. I would like to address a couple of issues that seem to be of interest to the Court. Judge Wallace, you raised the point that the upshot of the desktop underwriter system is that it will convey to the lender whether or not Fannie Mae is likely to buy the loan. That seems to be a linchpin of what Fannie Mae has been arguing. We'd like to point out that if Fannie Mae's intention was solely to convey whether or not it would buy a loan, it would do so after the loan is consummated. We don't have that here. Undeniably, they provide this report, a desktop underwriter findings report, specifically so that the lender can consider the information in it for purposes of evaluating the consumer's eligibility for a mortgage loan. Counsel, I want to pose a hypothetical to you and get your thoughts on this. Suppose that a completely separate company, Google or Microsoft or somebody like that, says, well, you know, I think we could make money by putting together a different, even easier to use software tool for lenders to use in their dealings with Fannie Mae. And they had a spiffy version of this DU that was, you know, even better, and you could license it or purchase it. Would they become a credit reporting agency? I don't believe so. And how is this any different? Well, I would like to say that's probably incomplete facts on the hypothetical for me to say definitively one way or the other. But in the situation that I'm understanding you to describe, someone is designing a technological tool for lenders to interface with Fannie Mae. And that's exactly what happened here. It just happens to be that Fannie Mae is the one that also is the Google or the Microsoft. We would respectfully disagree. I think that the record makes clear that Fannie Mae isn't selling a software product. As Judge Wallace pointed out, it's not something that the lender downloads on their computer and then proceeds to use. What this is, is an electronic platform that you need to go to a web portal and basically knock on the door and provide input criteria. And it's voluntary, right? You could still do it manually? The companies, the lenders could still do it manually if they wanted to? Absolutely. Absolutely. Now, we know that as a matter of course, overwhelmingly, lenders don't. They want the automated process. It's easier, just like my Microsoft or Google example. But the reason that I think that your hypothetical is distinguishable is that this isn't a situation that the lender is using a software product. What the lender is doing is contacting Fannie Mae and inputting criteria, just the same way that Sears would contact TransUnion and say, I would like a credit report. The lender contacts Fannie Mae and says, I would like a desktop underwriting. But they don't get a credit report from Fannie Mae. That's the difference. They don't get a credit report, and what they get is an indication whether Fannie Mae will automatically purchase the loan if the lender chooses to make it. Well, I would direct the court to an actual copy of a desktop underwriter findings report, which can be found at ER 542 to 547, for instance. This is a six-page analysis of the input criteria. The lender says, here is the borrower's name, here is the loan that the borrower wants, here is a credit report number for a tri-merge report. But it is not done for the purpose of furnishing that information to third parties. It's done for Fannie Mae's own purpose of determining whether to purchase a loan, and that's a requirement of the statute. I don't understand how you get around that. Okay. Two points. Number one is that if Fannie Mae only wanted to determine whether it would buy a loan, it would do that after the loan is consummated. Right. It doesn't have to. This is a hypothetical loan. The record confirms that Fannie Mae has a separate process. When a loan is delivered, it goes through a separate software program at Fannie Mae to confirm whether the loan that is actually delivered will, in fact, be bought. I know, but I don't understand how that pertains to furnishing reports to third parties. That is not Fannie Mae's purpose. The language of this plain text in the Consumer Reporting Agency does not tie the purpose for which Fannie Mae acts in general. It says, if you assemble or evaluate information for the purpose of furnishing a consumer report to a third party, which, clearly, the lender is a third party. I mean, there's no dispute in this record that the desktop underwriter system returns the final output of a desktop underwriter findings report through the electronic connection back to the lender. I don't even believe there's been a dispute as to whether or not it's been returned to a third party. So is your argument the same for those who use the now less popular manual method of informing Fannie Mae of what the intention may be in terms of the loan? In other words, the use of the software is optional. It's popular, but it's optional. So I'm asking now, if the lender does all this manually, is your argument the same or different? If the lender does this manually, there is no implication of the Fair Credit Reporting Act whatsoever. So it's merely the fact that people choose to do this by a computer that makes them a reporting agency? No. If you look at what Fannie Mae does, if you look at the operation of the desktop underwriter system, the electronic network that we have uncontroverted evidence, pages and pages in our brief between 5 and 17, with numerous record citations, the totality of the operation of the desktop underwriter system has one objective, and that is to return a desktop underwriter findings report to the lender. The desktop underwriter findings report does, in fact, convey a recommendation. It also conveys an underwriting analysis. It conveys raw credit data. It conveys Fannie Mae's observations about what it saw. And the sole purpose for the operation of the desktop underwriter system is to return that report. And that's absolutely dispositive, because if you look at the definition of a consumer report, it's any communication bearing on a consumer's creditworthiness that is used or expected to be used in whole or in part for purposes of establishing a consumer's eligibility for that mortgage. And Fannie Mae concedes that the purpose of desktop underwriter is to help the lender originate the loan. That is a quote from Fannie Mae. Desktop underwriter is intended to help originate the loan. The sole purpose is to return that desktop underwriter findings report so that the lender can utilize that information as a factor in considering whether or not to make the loan. That's what makes it a consumer report. By the plain definition of 1681 A.D., the information in that desktop underwriter clearly weighs on the consumer's creditworthiness and credit capacity. It is communicated to a third party, the lender, and it is not only expected by Fannie Mae to be used, but is, in fact, used by the lender to make its decision as to whether or not that loan will get made. And that goes to Judge Lasnik's point, that in reality, this was fundamental information relied upon by the lender to deny this loan. That's why the before consummation versus after consummation is fundamentally important, because if they truly only intended to say, yes, we will buy a loan or no, we won't, that happens once the loan is made on the back end. And the record does confirm they have a separate process to do that. When Fannie Mae actually. But the fact that they could do it before or after doesn't mean that the two don't have the same purpose. Your argument seems to assume that if they give a predictive decision rather than an actual decision, it's somehow a whole different animal. And I'm not sure why that would follow. I don't believe so. I think that if you look at the four corners of a desktop underwriter findings report, you cannot determine that it does not bear on a consumer's creditworthiness, which is used or considering whether or not they're going to get this mortgage. So I'm not suggesting that it doesn't have included in it a predictive term of whether or not Fannie Mae is likely to buy this. But the reality is, is the lender uses that as a factor in considering whether or not the consumer will get that mortgage. That's what makes it a consumer report. So the unambiguous language of 1681 A.F. of Consumer Reporting Agency says the assembly or evaluation of the information needs to be for the purposes of providing a report. Well, I'm still I also still I'm not there on the assembly of the information because it's the lender that does that. It's like if I gave you a blank form to fill out and said, you know, do you do you want a driver's license? Give me your address and your name and all this information. I'm not assembling it. I'm giving you a form. So how are they assembling the information that's input? That is flatly contradicted by the record. The lender takes a loan application and provides that input criteria to the system as a request to get a report. Everything else is done within the Fannie Mae system, within that network by Fannie Mae. They the defendant has very carefully. You just missed me on something done by Fannie Mae. It's done by the computer, isn't it? But I believe, as Ms. Maynard said, we all interface with software all the time, every day in what we do. I understand what we all do. But to answer my question, it seemed to me, it seemed to me that that you skipped a step there. I don't believe so, because if if there's software going on, it's Fannie Mae using the software. You mean Fannie Mae has somebody up there using it? Not at all. But your honor, when Sears goes to. No, no, don't go to Sears, go to Fannie Mae. Well, but I'm creating an analogy to the big three. I understand you made your analogy before, but I'd like to have you remain with my question. I'm having some difficulty determining why the case should turn on whether Fannie Mae has it in a written form or on a computer form. But if it's on a written form, we wouldn't be here. If it's on a written form, it doesn't produce the same kind of analysis. If there's a if there's a written form, there's no return of a consumer report. There's no return of a desktop underwriter findings report. The purpose of the desktop underwriter system is to return that report. And to answer your question. Report to whom? To the lender. To the lender to then use it as a factor in considering the consumer's eligibility for the loan. But to answer your question more specifically, Fannie Mae takes active steps at every turn within the desktop underwriter system. The lender puts in the input criteria and stops. You missed me. The computer does that. The computer makes that. Except Fannie Mae, and the computer's already been lended out to the user. It's misleading to suggest that the lender is using the software. Why? Because the software is not software product at all that anybody installs. It is a dynamic electronic platform controlled, designed, implemented, used, and observed by Fannie Mae at every step. And that's why I gave you the question I did about Microsoft or Google or some other company. If they did the same kind of program but didn't, you know, steal the intellectual property. If they came up with a better form that had all the same stuff and all the same kind of analysis that would help the lender talk to Fannie Mae about whether a loan would be purchased. You would, under your argument, they would become a credit reporting agency even though all they had done is design software. But I don't believe so. I think that does touch on the seller of software exception that the defendant refers to from the FTC. And the distinguishing characteristic in that cast opinion is whether or not the seller of software, the designer of software, ceases to have any connection to the process or to the information. In the hypothetical that you describe, Microsoft creates a product, packages it up, sends it off, and how people use it, Microsoft has no connection to that. Fannie Mae is operating its network. It's getting the raw credit data. It's applying the business rules. It's storing the files and taking file by file money for doing those things. When you say Fannie Mae is, you mean the computer is. No, it's more than just the computer, Judge Wallace. Can I just answer my question, please? No, it's Fannie Mae doing those things. So each time it comes in, there's a person at Fannie Mae that takes the information and works on it. I believe that the uncontroverted evidence confirms. Is that a yes or a no? Yes. That it's Fannie Mae. Is there an individual? No, but the record will confirm that there are dozens and dozens of Fannie Mae employees that work on desktop underwriter every single day. That is what their job function is, to apply those business rules and apply that risk analysis to ultimately produce this report. That's all they do. Thank you, counsel. You've exceeded your time, but we appreciate your argument. You have some rebuttal remaining? Thank you, Your Honor. Judge Wallace, no. The record shows, and I quote from Ms. Danko's declaration at ER 123, no individual or entity at Fannie Mae evaluates any consumer credit or other information or is otherwise involved in this process other than, of course, as creators of the computer code that comprises the software application. But Ms. Maynard, again, we're trying to break through to a new technology in a new world where we don't do things the way we used to. When I try to get a car on Getaround, I don't interface with any person in it either. It's a computer program that sends me to the wrong place and gives me the wrong access code and doesn't allow me to get the car. But, you know, it's like Fannie Mae set this up. They're the makers of the intellectual property. They tinker with it every day. I'm sure you have a department working on it all the time and upgrading it and the like. And so the fact that it doesn't have a human being on the other side is just welcome to the new world. No, Your Honor. The fact that it doesn't have a human being involved is relevant to the statutory language, which requires that a person be assembling or evaluating consumer credit information. And here the only person, excuse me, within the meaning of the statute doing that is the lender. The things to which counsel points in the record are the making of the software itself. And as I indicated originally, and the record shows that when Fannie Mae develops the software, when it updates the software, those are just software functions. It's no different as a legal matter than the software addressed by the FTC in the 1997 CAST opinion. And although counsel points to the no dispositive, the no connection to the information language in that opinion, that's not, was not dispositive in that opinion. And the FTC reaffirmed its guidance in the 2011 40 years report and did not put that caveat on it. The point is that, yes, we are moving into a modern world, but that shouldn't, what's really going on is that the lender is using an electronic version of the selling guide. And the fact that it's automated now, and in some instance easier for the lender to use, shouldn't change it from it being the lender who's the one doing the assembling and evaluating. So the selling guide gave you guidelines to apply, but the lender came to their own conclusion. The fact that a computer program produces a conclusion here, it's not a, may not be a person in the sense of flesh and blood, but it's an entity that gives an analysis that is crucial to whether or not the consumer gets the loan or not. How can we just ignore that and say, that doesn't matter, it's the same as if it was a piece of paper and somebody was doing some sort of analysis of it on paper. Well, because it's no different than Judge Graber's analysis of another company. It's just software. It's the same as the FTC's analysis. The lender is the one who's choosing to use the software. If the lender wants to know exactly how it works, the lender can use the book. If the lender wants the ease of using an automated system, the lender can choose to use this system. But, and there are other systems out there. That doesn't mean that Fannie Mae is the entity doing any assembling and evaluating just because it made this tool available. And even if it did, Fannie Mae's purpose for doing that doesn't fall within the statute. Its purpose for doing that is to give lenders a perspective view of whether or not it might purchase the loan, and it doesn't matter whether it's before or after the loan is made. The private mortgage insurer, it's an example from the agency's charge with enforcing this statute, is about before the loan was made. I'm happy to answer any other questions the court has, or we would request that you reverse. Thank you very much. Thank you, counsel. We appreciate the arguments of both counsel. They've been very helpful, and the case just argued is submitted. Our other argued case for this morning is Sulema v. Intel.
judges: Wallace, Graber, Lasnik